# Exhibit 45, Part 13 of 15

Også modtagelsen af nettoudbyttet kan kun være sket på pensionsplanens konto hos dens custodian, idet pengestrømmen fra selskabet ned igennem sub-custodykæden kun kan nå frem til custodian, ikke til nogen som helst anden bank eller finansiel virksomhed.

Da pensionsplanerne brugte et onlinesystem til at se pengestrømmene til deres egne konti, kan de uden computeren fra deres custodian ikke dokumentere alle disse pengestrømme. Det eneste, pensionsplanerne kan vise, er de cash account statements fra deres egne custodians, som de stadig har opbevaret i papirform, jf. bilag 90.

Alle pensionsplanernes pengemidler befandt sig under en TTC-klausul på Solo Capitals konto ved en eller flere forretningsbanker.

Da ingen af de fire custodians i Solo-gruppen havde en banklicens, der tillod dem at opbevare kontante midler, blev alle kontante pengemidler opbevaret på Solo Capitals konto i en almindelig forretningsbank. Ifølge pensionsplanernes seneste efterforskninger agerede Solo Capital herved subcustodian for sine tre datterselskaber (de tre andre custodians) og opbevarede således ikke kun egne kunders pengemidler, men også pengemidler tilhørende de tre datterselskaber og deres respektive kunder. Alle pengetransaktioner mellem kunder inden for Solo-gruppen kunne udføres, uden at det førte til bevægelser på Solo Capitals konto i dennes bank. Dette var helt i overensstemmelse med det europæiske CSD direktiv 909/2014 kapitel IV Artikel 9 om internaliseret afvikling.

Hvilken forretningsbank Solo Capital brugte, ved pensionsplanerne ikke med sikkerhed. Ud fra Sanjay Shah's processkrift til High Court i London lader det dog til, at Solo Capital opbevarede pensionsplanernes kontante pengemidler på en konto i Barclays.

Pensionsplanerne oprettede alle en konto i USA i forbindelse med deres stiftelse – jf. eksempelvis de som bilag 91 i førersagerne fremlagte kontoudtog – dog blev disse konti ikke brugt til gennemførelse af aktietransaktionerne og pengestrøm- mene i forbindelse hermed. Kontoudskrifter fra andre banker, der viser udbetalinger fra Solo til pensionsplanerne, kan ikke fremlægges, da de ikke havde fået udbetalt deres gevinst fra deres custodian til en anden bank endnu, da Solo Capital i sommeren 2015 blev lukket ned og sat under administration af PwC.

Pensionsplanerne havde ingen grund til at lade gevinsten fra udbyttearbitrage- transaktionerne udbetale til en anden konto i USA, da en udbetaling til de begunstigede ikke umiddelbart stod for døren. Gevinsterne var i førersagerne dog under alle omstændigheder under et beløb, der ville føre til en rapporteringspligt til IRS.

Grunden til, at gevinsten, der blev hængende hos pensionsplanerne, var under USD 250.000, er de høje transaktionsomkostninger, som er beskrevet i afsnit 2. Ikke mindst Solo-gruppen fakturerede betydelige beløb til pensionsplanerne (jf. afsnit 2.3.4.) for deres tjenesteydelser, og for at Solo-gruppen i sidste ene måtte indestå som garant for, at aktierne ville blive betalt, hvis en aktielåntager ikke blev fundet i tide.

### 7.2.2.2 Strøm af aktier

Dokumentation af en strøm af aktier (eller udbytte) gennem kæden af custodians kan pensionsplanerne ikke fremlægge, da ingen custodian oplyste pensionsplanerne om, hvem deres respektive subcustodian er. Men når afviklingen af en aktiehandel ikke er nødvendigt for at være ejer af en dansk aktie, og det først er ved afviklingen af en handel, at der eventuelt foretages en "strøm af aktier" gennem kæden af custodians (nemlig hvis der ikke sker en internaliseret afvikling), er en sådan strøm af aktier gennem custody-kæden tilmed uden bevisværdi.

Endelig skal bemærkes, at netting-procedurerne, der anvendes af alle clearing- og afviklingsagenter, fører til, at det er umuligt at følge nogen som helst aktie gennem kæden af subcustodians.

**7.2.3 TTC-klausulen**

Skattestyrelsen påstår, at pensionsplanerne ikke har dokumenteret TTC-klausulen. Som forklaret på kontormøderne, var TTC-klausulen oprindeligt en bestanddel af custody agreements. I 2014 blev denne klausul taget ud af custody agreements og sat ind i de almene forretningsbetingelser, der skulle accepteres online.

For Pegasus Fox 23 LLC Solo 401K Plan er der i førersagerne fremlagt en custtody agreement, der indeholder TTC-klausulen. I øvrigt er der fremlagt et eksempel på en udskrift fra forretningsbetingelserne, der skulle godkendes online. Denne godkendelse kan pensionsplanerne ikke dokumentere, da SØIK har beslaglagt computerne fra Solo-gruppen. Pensionsplanerne har dog fremlagt dokumentation for, at pensionsplanerne har besluttet at godkende de almene forretningsbetingelser.

**7.2.4   Enkelte kontoåbningsdokumenter og transaktionsdokumenter**

For nogle af pensionsplanerne mangler den ovennævnte dokumentation vedrørende transaktionerne og kontoåbningsproceduren. Det er hovedsageligt, fordi de respektive pensionsplaners trustees ikke længere har adgang til den e-mailkonto, som alle transaktionerne blev afviklet over. Det kan dog formodes, at alle transaktionerne for samtlige af de pensionsplaner, som TVC Advokatfirma/Schaffelhuber Müller & Kollegen S.à r.l. repræsenterer, og som var kunder i Solo-gruppen, blev gennemført på samme vis. Den fremlagte dokumentation fra de øvrige pensionsplaner kan derfor anvendes analogt.

**7.2.5   Dokumentation i 2014 og 2015**

For handler gennemført i 2014 foreligger der flere dokumenter end for handler gennemført i 2015. Det har den simple årsag, at handlen blev automatiseret i 2015 med indførelsen af softwaresystemerne Octave, og BrokerMesh til at varetage opgaverne omkring ordrer (algo trading), handel, clearing og settlement. Det er kun beklageligt, at Skattestyrelsen nægter eksistensen af algo trading. Pensionsplanerne henviser Skattestyrelsen til kapitalmarkedslovens § 3, nr. 18 og nr. 20, der regulerer algo trading.

Faktum er, at algo traderen foretog valget af aktier, der skulle købes (idet algoritmen kendte udbyttedatoen og det udbytte, der blev forventedes udloddet), samt antallet, som hver pensionsplan ville købe. Dette skete ud fra programmerede aspekter om finansieringsmuligheder for den enkelte pensionsplan, risikoprofil og risiko- spredning etc.

Skattestyrelsens påstand med hensyn til algo trading (jf. det sammenfattende ind- læg af den 9. august 2019, side 44), ifølge hvilken

> "Hvis der findes en algoritme, som pensionsplanerne anvender, så må den alene være blevet anvendt til at sløre de påståede aktiehandlers manglende realitet"

er fuldkommen absurd. Det er ikke slet ikke formålet med algo trading at sløre aktiehandler og deres realitet.

Alle aktiehandler, også de, der blev clearet af Solo-gruppen, blev indrapporteret til myndighederne i London (FCA og børsen) på behørig vis (daglig trade- og transaction reports), som de allerede fremlagte statistikker fra Finanstilsynet dokumenterer. Disse indrapporteringer ville Skattestyrelsen få bekræftet at SØIK, hvis styrelsen blot ville anmode SØIK herom. En sådan bekræftelse kan på ingen måde være til skade for eventuelle strafferetlige undersøgelser, der efter 3½ år angiveligt stadig er i gang.

Det reelle formål med algo trading er at forøge handelsvoluminet med mindre risiko for fejl, idet menneskelig indblanding elimineres mest muligt.

Algo trading kan heller ikke sløre aktiehandlerne, idet de som allerede nævnt indberettes til finanstilsynet (FCA) og børsen (LSE) i London.

Som resultat af disse indberetninger har den tværministerielle arbejdsgruppe i sit statusnotat af den 27. juni 2016 således også kunnet konstatere:

> *"I forbindelse med arbejdet i den tværministerielle arbejdsgruppe har udvalget modtaget oplysninger om handelsstatistik fra Finanstilsynet for årene 2012-2015, der viser aktiehandler for udvalgte børsnoterede danske selskaber. Det fremgår heraf, at der blandt andet er bemærkelsesværdigt store aktiehandler omkring tidspunktet for udlodning af udbytte. Arbejdsgruppen har på nuværende tidspunkt ikke afdækket årsagen hertil, herunder om handlerne kan være skattemotiverede. SKAT vil undersøge dette nærmere."*

**7.3 Ansvaret for manglende dokumentation**

Skattestyrelsen påstår, at

> *"Pensionsplanerne gemmer sig i den sammenhæng i vidt omfang bag, at danske og engelske myndigheder har beslaglagt materiale fra deres custodians"*

Hertil bemærkes indledningsvis, at der ikke er tale om at "gemme sig", bag det simple faktum at materialet virkelig er beslaglagt. Det er desværre et faktum i sagen, at myndighederne har beslaglagt de computersystemer, der afviklede aktiehandlerne. Pensionsplanerne har derfor ikke mulighed for at eftervise alle de elektroniske transaktioner, der foregik efter afgivelsen af ordrer til køb af aktierne.
Matching af købs- og salgsordre skete elektronisk, clearing og settlement skete elektronisk, og selve opbevaringen og eksistensen af aktierne var elektronisk. Dematerialiserede aktier eksisterer nu engang kun i elektronisk form.

Al dokumentation, der er udstedt, er derfor ikke mere end en fysisk genspejling af, hvad der foregik rent elektronisk. Uden adgang til de elektroniske transaktioner er pensionsplanerne begrænset til at fremlægge dokumentationsmateriale i papirform, der ikke udgør selve retsakterne, men blot er udtryk for, at retsakter er blevet udført. Når disse udtryk for, at retsakter har fundet sted, udstedes af mennesker, indeholder disse naturligvis også de ganske almindelige menneskelige fejl såsom skrivefejl i datoer eller ISIN-numre, anvendelser af forkerte skabeloner (der viser køb i stedet for salg) og for små felter, der ikke kan udvise de mange tal og derfor kun giver et udprint med *"####"*.

Computersystemerne er de vigtigste bevisgenstande i sagen, da de elektroniske retsakter blev udført her. Disse computersystemer har SØIK haft i sin besiddelse i årevis, uden at dette har ført til nogen positiv bekræftelse af, at pensionsplanerne ikke ejede de danske aktier. Det må være udtryk for, at SØIK virkelig har fundet elektronisk dokumentation for afviklingen af aktiehandlerne. Da afviklingen først skete, <u>efter</u> at der var indgået en endelig aftale om køb af aktierne, der overdrog ejerskabet til aktierne til køberen, er afviklingen dokumentation for, at ejerskabet inden da var overdraget ved matching af købs- og salgsordre.

**8 FOR MEGET UDBETALT UDBYTTESKAT**

**8.1 Summen af alle refusioner**

Skattestyrelsen præsenterer i flere af styrelsens indlæg forskellige statistikker, af hvilke det angiveligt skulle fremgå, at SKAT skulle have udbetalt mere i refusion end modtaget i udbytteskat.

Disse af SKAT selv fremstillede statistikker står i modstrid med de offentligt tilgængelige statistikker.

I henhold til SIR-rapporten af den 24 september 2015 (Skatteudvalget 2014-15 –2. samling) SAU Alm del), side 16, har SKAT ikke udbetalt mere i refusion end modtaget:

Af side 16 fremgår således:



Graf 7.2, der fremgår nedenfor, omfatter indtægter, refusioner samt antal ansøgninger om refusioner for årene 2005 til juni måned 2015.

Graf 7.2.

Denne grafiske fremstilling understøttes af tabel 7.1, side 15, i samme SIR-rapport:

Tabel 7.1 omfatter indtægter (udbytteskat), refusioner samt antallet af ansøgninger vedrørende refusion pr. år fra 2005 til juni 2015.

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 Jan - juni |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Indtægter i mia. kr. | 6,69 | 9,36 | 9,94 | 11,1 | 8,06 | 6,36 | 9,65 | 8,71 | 11,69 | 13,2 | 18,51 |
| Refusioner i mia. kr. | 1,18 | 1,88 | 1,07 | 0,75 | 0,75 | 0,68 | 1,12 | 1,45 | 2,79 | 6,06 | 8,73 |
| Antal ansøgninger | 16.617 | 18.618 | 15.687 | 16.655 | 21.284 | 21.451 | 24.292 | 30.765 | 33.861 | 41.764 | 34.850 |

Tabel 7.1.

Lidt mere aktuelle tal fremlægges i rapporten fra den tværministerielle arbejdsgruppe 2016/2017. Også disse viser, at der ikke blev udbetalt mere i refusioner, end der var modtaget fra de danske selskaber. Fra denne rapport stammer nedenstående skema, der viser Danmark nettoindtægter fra udbytteskat på aktier:

**Tabel 2.1. Indtægter fra kildeskatten på udbytter**

| Mia. kr. (løbende priser) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bruttoindtægter fra udbytteskat | 6,7 | 9,4 | 10,0 | 11,1 | 8,1 | 6,4 | 9,7 | 8,7 | 11,7 | 13,2 | 22,2 |
| Modregnet i selskabsskat[1] | -1,2 | -1,6 | -1,8 | -2,1 | -0,8 | -0,6 | -0,9 | -1,1 | -1,6 | -1,7 | -3,6 |
| Refusioner[2] | -1,2 | -1,9 | -1,1 | -0,8 | -0,8 | -0,7 | -1,1 | -1,5 | -2,8 | -6,1 | -10,9 |
| *Heraf økonomisk kriminalitet* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *-0,1* | *-0,7* | *-3,8* | *-7,8* |
| Nettoindtægter fra udbytteskat[3] | 4,3 | 5,9 | 7,0 | 8,3 | 6,5 | 5,1 | 7,6 | 6,2 | 7,9 | 9,3 | 15,5 |

Det bestrides således principielt, at SKAT skulle have udbetalt mere i refusion, end der blev indbetalt.

Det eneste, der kan ses ud fra de fremlagte statistikker, er, at antallet af refusioner er steget betragteligt. Men at sælge aktierne inden udbyttedatoen til en aktionær, der er refusionsberettiget, er jo også netop er motivationen for sælgeren af aktierne – og det faktum, der bringer markedet for derivater (forwards og futures) ud af balance med spotmarkedet. Statistikken viser således blot, at investorer, der interesserer sig for udbyttearbitrage, fra 2014 for alvor henvendte sig til det danske aktiemarked.

Skattestyrelsen lader i det sammenfattende indlæg i førersagerne af den 9. august 2019 således også til at opgive denne helt åbenbare falske påstand om for meget udbetalt udbytterefusion, idet det igennem samtlige tidligere indlæg fremførte argument nu opgives.

### 8.2 Summen af refusioner pr. udloddende selskab

Skattestyrelsen henviser i det sammenfattende indlæg i afsnit 2.1 nu kun til samtlige refusioner foretaget i henhold til TRYG A/S. Skattestyrelsen ønsker at afvise pensionsplanernes retskrav på refusion, med den begrundelse at der i alt er ansøgt om refusion for ca. kr. 151 mio. TRGY A/S havde for det pågældende skatteår (2015) dog kun indeholdt ca. kr. 123 mio. i udbytteskat. Ud af de kr. 151 mio. havde amerikanske pensionsplaner modtaget kr. 136 mio.

Hertil bemærker Skattestyrelsen i afsnit 2.1, side 6, at

> *"der har været søgt - og udbetalt – langt mere i refusion, end der har være indeholdt. Det siger sig selv, at der aldrig kan være krav på refusion af mere, end der har været indeholdt".*

Skattestyrelsen er dog ikke i stand til at dokumentere, hvem der konkret ikke skulle være berettiget til refusion. En pensionsplans krav på refusion kan ikke nægtes, med henvisning til at en anden modtager af refusion eventuelt ikke har været berettiget til at modtage denne.

Ved at citere dette eksempel har Skattestyrelsen valgt (frivilligt eller tilfældigt) at dokumentere, at udbytteskattesystemet lider under en systemisk fejlfunktion, og at der ikke er tale om svindel. Skattestyrelsen har ingen forklaring på, hvorfor der er udbetalt ca. kr. 151 mio. i refusion, mens der kun er indbetalt ca. kr. 136 mio. af Tryg A/S.

Selvom Skattestyrelsen hævder, at alle ansøgninger fra kunder i Solo-gruppen, som beløber sig til kr. 136 mio., var svindel, hvilket klart bestrides, så er der stadig en difference på kr. 15 mio., der er udbetalt mere end indbetalt (forskellen mellem kr. 136 mio. og kr. 151 mio.). Der må derfor helt klart være en anden forklaring på uoverensstemmelserne. Den mest nærliggende er, at der ikke er udbetalt for meget, men snarere indbetalt for lidt udbytteskat.

Hvis den retmæssige ejer af en aktie på udbyttedatoen ikke identificeres korrekt, beregnes den udbytteskat, som skal indbetales, også forkert.

### 8.3 Fejlfunktioner ved administration af udbytteskat

Selvom det ikke er pensionsplanens opgave at analysere det danske udbytteskattesystem og forklare, hvordan det kan ske, at der udbetales mere i udbytterefusion for et bestemt selskab, end dette selskab har indbetalt i udbytteskat, skal vi alligevel gerne komme med vores bud på de mest indlysende forklaringer på dette misforhold:

1. Bankordningen – regnearksløsningen – har ført til, at der blev udbetalt udbytterefusion til bankerne uden dokumentation for ejerskab af aktierne henholdsvis modtagelse af udbytte. Da betalingerne til bankerne ikke blev registreret af SKATs egen "3-S"-platform – se Bech-Bruun-rapporten, side 92 ff., samt SIR-rapporten af den 24. september 2015, pkt. 11.4 – kunne bankernes ansøgninger føre til, at der blev udbetalt refusion for samme aktie flere gange. En via bankordningen og en anden via blanketordningen. Bankordningen blev stoppet i 2015, da man blev klar over problemerne, dog kun med den officielle forklaring, at der manglende retlig hjemmel for løsningen. Faktum var imidlertid, at bankerne havde modtaget refusioner af indeholdt udbytteskat uden tilstrækkelig dokumentation for retmæssigt ejerskab af aktierne. En undersøgelse af bankordningen er derfor med rette nu også sat i gang af skatteministeren.
2. Sælger en aktionær på udbyttedatoen sine aktier til en køber med en anden skattestatus, og afvikles handlen med en længere frist end den af VP Securities anvendte (dvs. nu længere end T+3), vil VPSecurities anvende den forkerte skatteprocent ved beregningen af udbytteskatten. Er sælger fx fritaget for skat, og er dette registreret ved VP Securities, beregnes, der ikke udbytteskat af det udbytte (jf. Skattestyrelsens bilag AO), som umiddelbart sendes til sælgeren af aktierne (fordi han stadig er registreret som ejer på "record day"). Idet køberen af aktien ikke kan vide, at sælgeren er registreret som skattefri ved VP Securities, forventer køberen kun at modtage et nettoudbytte. Det er kun nettoudbytter, der cirkulerer under "market claims"-processen mellem de forskellige custodians og subcustodians. Køberen (pensionsplanen), der modtager et nettoudbytte, er berettiget til refusion, da han var den retmæssige ejer af aktien på udbyttedatoen. VP Securities har dog ikke beregnet de 27 pct. udbytteskat. Dem er sælgeren af aktien løbet med.
3. Udbytteskatten beregnes på baggrund af registreringerne hos VP Securities. VP Securities kender dog ikke de retmæssige ejere af danske aktier. Den retmæssige ejer kan bl.a. i tilfælde af aktieudlån være en anden med en helt anden skattestatus end den registrerede civilretlige ejer.
4. Fejlene i den måde, hvorpå skattemyndighederne har administreret refusion af indeholdt udbytteskat, er endnu mere åbenlyse i tilfældet med short selling. Hovedproblemet med short selling, der udløses af aktieudlån gennemført af banker, formueforvaltere og ikke mindst hedge fonde, er, at det fører til en stigning af aktiernes "free-float" – dvs. aktier, der er til rådighed på markedet – udover 100 pct. af alle aktier udstedt af et selskab gennem VP Securities, og at dette gør det muligt, at der er mere end én retmæssig ejer af en og samme aktie.

Dette er, efter vores opfattelse, de mest indlysende forklaringer på, hvorfor der kunne være udbetalt mere i refusion af udbytteskat, end de beløb de danske skattemyndigheder har modtaget fra selskaberne, hvis denne påstand af Skattestyrelsen skulle være korrekt.

Eksemplet, som Skattestyrelsen ønsker at anvende som dokumentation for at nægte pensionsplanerne udbytterefusion, bekræfter blot, at et system til administration af udbytteskat, der er baseret på registreringerne ved VP Securities, lider under alvorlige mangler. De retmæssige ejere, der er berettiget til refusion, kan ikke identificeres ved disse registreringer.

Som påvist ovenfor er det i henhold til gældende ret ejeren af aktierne, der har ret til udbytterefusion, hvis han er den retmæssige ejer af aktierne på udbyttedatoen og har modtaget nettoudbyttet. Den retmæssige ejer af aktierne har ingen pligt til at undersøge eller dokumentere, om andre retmæssige ejere ligeledes anmoder om refusion. Dette er tillige også ganske umuligt for en ejer af en aktie (eller for nogen som helst anden person).

Som allerede påvist ovenfor kan der være flere retmæssige ejere af danske aktier end svarende til det antal aktier, som et dansk selskab har udstedt.

Skatteministeriet har til trods for den meget klare "Early Warning" af 2015 ikke løst problemet omkring aktielån og short selling, men i det mindste erkender ministeriet i statusnotatet af den 26. juni 2016, at Danmark simpelthen ikke har et system eller regler til at identificere den retmæssige ejer af danske aktier (side 6).

## 9 PENSIONSPLANENS FINANSIELLE TRANSAKTIONER

### 9.1 Finansiering af aktiekøb

Pensionsplanen har med rammeaftalerne om aktieudlån (GMSLA'er) samt de fremlagte e-mails, hvorved de enkelte aktielån trækkes under GMSLA'en, dokumenteret, at den rådede over de nødvendige finansielle midler til at betale for aktierne, i det øjeblik udlånet foretoges. Dermed kunne pensionsplanen betale for aktierne på leveringsdatoen.

Et ejendomsforbehold, der gjorde, at ejerskabet til aktierne først gik over til pensionsplanen (jf. kapitalmarkedslovens § 188, stk. 1), var ikke gjort gældende af sælger ved indgåelsen af købekontrakten. Pensionsplanen blev således allerede inden betaling af aktierne civilretlige ejere af aktierne. Dette ejerskab blev efterfølgende sikret ved registreringen hos dennes custodian. Denne sikringsakt medførte, at pensionsplanen kunne modtage det udbytte, som i henhold til købelovens § 19, stk, 1, tilkommer pensionsplanen som køber af aktierne.

Skattestyrelsen har rejst tvivl vedrørende spørgsmålet om, hvorvidt en aktielåntager ville stille et beløb til sikkerhed, som svarer til aktiernes markedsværdi dagen før aktielånet, dvs. før ex-datoen.

At det er normal kutyme, at aktielåntager skal stille et større beløb i kontant sikker- hed end markedsværdien på lånedatoen, har pensionsplanen dokumenteret ved at fremlægge dokumentation for, hvor meget eksempelvis Nordnet forlanger i garantistillelse.

HJÆLP



Aktier som kan shortes

Læs mere om shorthandel

## Aktier som kan shortes

Valuta DKK

Hvis du vil shorte aktier som ikke findes med på listen over dagen, kan du kontakte Nordnets mæglere på telefon 70 20 66 85.

| Navn | Kortnavn | Sikkerhedskrav |
|---|---|---|
| A.P. Møller - Mærsk A A/S | MAERSK A | 125o |
| A.P. Møller - Mærsk B A/S | MAERSK B | 125o |
| ALK-Abelló B A/S | ALK B | 150o |
| Alm. Brand A/S | ALMB | 140o |
| Ambu A/S | AMBU B | 150o |
| Bavarian Nordic A/S | BAVA | 160o |
| Carlsberg B A/S | CARL B | 115o |
| Chr. Hansen Holding A/S | CHR | 125o |
| Coloplast B A/S | COLO B | 120o |
| DFDS A/S | DFDS | 130o |
| DSV A/S | DSV | 115o |
| Danske Bank A/S | DANSKE | 120o |
| FLSmidth & Co. A/S | FLS | 125o |
| GN Store Nord A/S | GN | 120o |
| Genmab A/S | GEN | 170o |
| H. Lundbeck A/S | LUN | 130o |
| ISS A/S | ISS | 120o |
| Jyske Bank A/S | JYSK | 130o |
| Matas A/S | MATAS | 125o |
| Nordea Bank Abp | NDA DK | 120o |

https://www.nordnet.dk/mux/page/blankningin1.html                17.02.2019

Skattestyrelsen forsøger i styrelsens sammenfattende indlæg af den 9. august 2019 under pkt. 8.12, side 74, at fordreje rollerne i et aktieudlån ved at påstå, at det er aktielångivers egenkapital, der spiller en rolle for, hvilket beløb der skal stil- les i kontant sikkerhed for et aktieudlån. Det er det naturligvis ikke. Formålet med den kontante sikkerhedsstillelse er at sikre et eventuelt dækningskøb, hvis låntage- ren ikke leverer aktierne tilbage.

Skattestyrelsen undlader i sin beskrivelse af Nordnet at nævne, at det ikke er bankens kapitalstyrke, der er afgørende for, hvor meget kontant sikkerhed de kan forlange af deres kunder. Faktum er, at når Nordnet låner aktier ud til deres kunder, så er banken selv nødt til at låne aktierne andetsteds. Nordnet

Sagsnr. 18-0004312                      Side 159/229

må herved stille sikkerhed, i samme størrelsesorden som banken selv forlanger af sine kunder, hvis banken vil arbejde konkurrencedygtigt i markedet.

Der hvor låntagers og långivers kapitalstyrke kommer til udtryk, er i de løbende forhandlinger om renten, som pensionsplanen skal betale for den kontante sikkerhedsstillelse, og lånegebyret, som låntager skal betale for at låne aktierne. Jo stærkere aktielåntagers kapitalstyrke er i forhold til aktielångiveren (pensionsplanen), des bedre kan aktielångiver påtvinge en højere rente og et lavere aktielånsgebyr. Det samlede resultat af renten, der skal betales på de kontante midler, og gebyret, der skal betales for aktielånet, betegnes i branchen som "rebate".

For så vidt angår konsekvenserne af et eventuelt prisfald på aktiemarkedet, henvises til standardbetingelserne under GMSLA, der allerede forudser, hvordan parterne skal håndtere dette.

**9.2 Muligheden for at gennemføre de omhandlede finansielle transaktioner**

Skattestyrelsen mener, det skulle ligne en kabale at få alle tre transaktioner til at finde sted samtidig, nemlig at (1) finde en aktiesælger, der vil sælge til pensionsplanen, (2) finde en aktielåntager, der skulle bruge aktierne og var villig til at stille købsprisen som kontant sikkerhed for aktielånet, og (3) finde en forward counterpart, der kunne bære et eventuelt kurstab på aktierne.

Skattestyrelsen forsøger, at få det til at fremstå som en umulighed. Det er dog ingenlunde tilfældet.

I modsætning til hvad Skattestyrelsen påstår, drejer det sig her ikke om tilfældigheder, men om <u>ganske normale transaktioner på internationale finansmarkeder</u>. Her indgås aftaler med brokere til at formidle køb og salg af aktier samt derivater og rammeaftaler med mellemmænd i aktielån (stock loan intermediaries), længe inden en eneste transaktion afvikles. Alle de enkelte transaktioner er således tilrettelagt, længe inden de gennemføres. Finansindustrien adskiller sig på dette punkt fra enhver anden form for industri. Overalt skal alle bestanddele af det, der skal produceres (biler, huse, brød eller strukturerede finansprodukter som udbyttearbitrage) planlægges og koordineres i forvejen, for at alt er til stede på rette tidspunkt i maskineriet. Mangler blot en enkelt bestanddel, fungerer slutproduktet ikke.

Hvad angår udfordringen at finde en sælger, der vil sælge til en pensionsplan, er svaret ganske enkelt: Sælgeren til pensionsplanen var ikke den tidligere ejer af aktien, men pensionsplanens fondsmægler, der gennemførte transaktionerne som ejermatching-handler. Det vil sige, at han selv solgte aktierne til pensionsplanen. Aktierne skaffede han fra en anden fondsmægler, der selv skaffede dem fra den oprindelige aktionær. Det er på denne måde, at ejermatching-handler foregår.

Pensionsplanens fondsmægler vidste, at pensionsplanen havde indgået en rammeaftale om udlån af aktieposter, og at pensionsplanen derfor havde en konstant mellemmand (stock loan intermediary), hvis eneste opgave var at fremskaffe aktieudlån. Mægleren vidste derfor, at pensionsplanen allerede inden købet af aktierne ville kontakte mellemmanden til aktieudlån for at høre, om han kunne formidle et udlån mod den nødvendige kontante sikkerhed, hvis pensionsplanen ville købe aktierne.

Fondsmægleren modtog desuden accept fra pensionsplanens clearing-agent, om at handlen ville gennemgå clearing og afvikling. Clearing-agenten overtog derved risikoen for, at betaling skulle ske ved levering af aktien. Denne risiko kunne clearing-agenten i sin egenskab af prime broker overtage, idet clearing-agenten selv ville modtage aktierne, hvis pensionsplanen ikke kunne betale.

At finde en sælger er derfor absolut ingen udfordring i praksis, når alle forretningsforbindelser først er etableret.

Som det fremgår af de som bilag 78 fremlagte e-mails, lykkedes det trods al forberedelse heller ikke altid alle pensionsplanere i hvert eneste tilfælde at placere en ordre til køb af aktier. Dette kan teoretisk skyldes, at der ikke var et tilsvarende udbud af aktier på markedet, eller at clearing-agenten ikke havde givet sit tilsagn om at ville indestå for afviklingen af handlen. Hvilket af de to scenarier, der konkret var tilfældet, spiller for så vidt ingen rolle. Faktum er dog, at pensionsplanerne netop ikke altid fik "kabalen til at gå op", sådan som det igen fuldstændig udokumenteret påstås af Skattestyrelsen.

Det samme gælder for udfordringen at finde en forward counterpart. En forward formidles også af mæglere. Den ultimative modpart til forward-kontrakten kan have mange forskellige grunde til at indgå kontrakten. En af dem kan være at spekulere i, hvor meget aktiekursen vil falde, når udbyttet udloddes. En anden kan være, at forward-modparten vil sikre sig kursen, som han kan købe aktierne tilbage fra markedet til, efter at han oprindeligt har solgt sine aktier til markedet før udlodningen af udbyttet. Det kan herved dreje sig om en ren spekulationsforretning, eller som nævnt ovenfor en udlænding, der ville miste de 27 pct. udbytteskat, hvis han ejede aktien på udbyttedatoen.

Endelig er der aktielåntageren, hvis motivation allerede er beskrevet udførligt i dette indlæg. Også aktielåntageren findes gennem professionelle stock loan intermediaries. Den på forhånd indgåede GMSLA-rammeaftale sikrer pensionsplanen, at aktierne kan lånes ud, når der opstår behov herfor. En kort samtale med mellemmanden inden aktiekøbet sikrer pensionsplanen, at det konkrete udlån kan foretages i rette tid til at betale for aktierne.

At finde alle disse modparter er ganske rigtigt ikke noget, der gøres på kort tid. Derfor tager kontoåbningsproceduren hos de forskellige professionelle aktører også så lang tid. Alle kontrakter skal på plads, inden handlen kan begynde.

Det bedste bevis for, at dette er muligt i den virkelige verden og forholder sig netop som beskrevet i vores indlæg, er, at alle handels- og transaktionsrapporterne blev indleveret til de respektive ansvarlige (tilsyns-)myndigheder i London (FCA og LSE). Dette understøttes yderligere af den omfangsrige dokumentation for transaktionerne (custody statements = kontoudskrifter, elektroniske depotregistreringer, handelsnotaer fra fondsmæglerne, custodians reviderede årsregnskaber osv.).

Det bemærkes videre, at den følgende statistik fra Finanstilsynet over omsætningen af danske aktier, som er blevet fremlagt i sagerne, bekræfter, at det i virke- lighedens verden forholder sig som anført:



Det faktum, at der er et dagligt handelsomfang af danske aktier på mere end kr. 100 billioner, betyder netop, at utallige investorer hver eneste dag handler aktier i de samme selskaber på det samme tids- punkt. Mange investorer vælger netop at handle en bestemt aktie, når udbetalingen af et udbytte står for døren. Alt dette er ikke noget tegn på svindel.

Havde der virkelig været reelle tegn på svindel i sagerne, måtte der også fra anklagemyndighedens side foreligge mistanke, af en styrke der ville føre til sigtelse af pensionsplanerne eller deres trustees. Ret- ten i Lyngby har ved kendelse af den 18. marts 2019 tilkendegivet, at dette hverken er tilfældet for Do- ston Bradley eller nogen af de af ham forvaltede pensionsplaner (bl.a. prøvesagen for Pegasus Fox 23 LLC Solo 401K Plan). Kendelsen fremlægges som bilag 92.

På linje hermed har de engelske anklagemyndigheder i november 2019 også besluttet at indstille deres egne efterforskninger i sagsforløbet. De vil kun yde Danmark den i henhold til internationale aftaler påkrævede assistance, jf. Justitsministeriets meddelelse til Folketingets retsudvalg citeret i artikel af den 16. november 2019, som her fremlægges som bilag 93. Endvidere fremlægges som bilag 94 skri- velse fra de engelske anklagemyndigheder, hvoraf det fremgår, at de ikke længere af egen drift fort- sætter undersøgelserne mod tidligere ansatte i Solo-gruppen.

Til trods herfor påstår Skattestyrelsen fortsat, at pensionsplanernes arbitrageforretninger

> *"alene fungerer som bogføringsmæssige posteringer uden virkelige handler"*
> (sammenfattende indlæg af den 9. august 2019, side 28)

Det forholder sig dog således, at al handel med dematerialiserede aktier i dag kun manifesterer sig i form at elektroniske, bogføringsmæssige registreringer, da der ikke længere eksisterer nogen dokumenter i papirform, der overdrages. Pensionsplanerne afgav elektroniske ordrer til deres mæglere, ligesom enhver anden kunde ville gøre det til sin mægler. Mægleren matchede elektronisk pensionsplanernes købsordrer med salgsordrer i henhold til gældende regler og under overvågning af det britiske FCA. Efter matchingen af ordrerne blev der elektronisk givet clearing-instruktioner til clearing- og settlement-agenten. Såvel instruktioner til clearing og settlement som også til selve gennemførelsen heraf sker i dag altid elektronisk, da dematerialiserede aktier slet ikke kan cleares, afvikles og opbevares i nogen anden form end elektronisk.

En aktiehandel manifesterer sig i dag således kun elektronisk og er reel, når disse elektroniske posteringer er baseret på virkelige transaktioner, der i dag ligeledes er elektroniske. Handlerne, der blev gennemført af pensionsplanerne via de britiske mæglere og clearing- og settlement-agenter, adskiller sig dermed på ingen vis fra handler, der gennemføres ved enhver anden dansk bank. Også her gennemføres alt helt elektronisk ved bogføringsmæssige posteringer.

Købet af en e-bog er i dag heller ikke andet end bogføringsmæssige posteringer og elektroniske transaktioner. Ikke desto mindre er såvel købene af de dematerialiserede aktier, som pensionsplanerne foretog, lige så virkelige som ethvert onlinekøb af en e-bog.

**9.3 Registreringer i VP Securities er uden betydning**

**9.3.1 Betydningen af en registrering ved VP Securities**

Skattestyrelsen har gentagne gange igennem samtlige indlæg argumenteret for, at *"Pensionsplanerne ikke var ejere af de i sagen omhandlede aktier."* Om skattestyrelsen hermed mener civilretligt eller skatteretligt ejerskab, undgås det konsekvent at konkretisere, og i stedet insisteres på et juridisk ukendt begreb om "faktisk" ejerskab.

Skattestyrelsen hævder, at pensionsplanen ikke var "ejer" af aktierne, fordi den ikke købte nogen aktier. Det lader til, at Skattestyrelsen herved henviser til, at pensionsplanen ikke skulle være de civilretlige ejere af aktierne og dermed ikke den skattemæssige ejere, blot fordi de ikke kan findes i VP Securities' register.

Skattestyrelsen indrømmer endeligi førersagerne i indlægget af den 9. maj 2019, afsnit 4.10, og i det sammenfattende indlæg af den 9. august 2019, afsnit 8.11, at en registrering ved VP Securities ikke er nødvendig for at være ejer af en aktie. Ellers ville Skattestyrelsen ikke have trukket sig tilbage til et udsagn om, at

> *"Data fra VP Securities skal indgå i bevisvurderingen".*

Det er herved klart, at registreringer ved VP Securities blot er et af flere mulige beviser for ejerskab. Skattestyrelsen lader endelig til at erkende, at omnibus depoter gør det umuligt for VP Securities at bekræfte, at en person IKKE er aktionær. VP Securities kan kun bekræfte, at en person er aktionær, når og hvis en sådan person har et depot hos VP Securities.

Skattestyrelsen mener i styrelsens sammenfattende indlæg af den 9. august 2019, afsnit 8.11, at det skulle være

> "relevant, om pensionsplanerne eller deres custodians har haft depoter i VP Securities – eller om de kan vise, gennem hvilke sub-custodians de efter sigende har ejet aktier."

At en eksisterende registrering ved VP Securities entydigt eftervise civilretligt ejerskab, har pensionsplanerne aldrig sat spørgsmålstegn ved. Det er jo netop formålet med registreringen af ejerskabet ved en custodian, at ejerskabet opnår beskyttelse mod ekstinktion. Men beskyttelse er netop ikke ensbetydende med "eksistens eller manglende eksistens". Ejerskab kan meget vel bestå uden denne beskyttelse.

Skattestyrelsen kan under gældende EU-lovgivning dog ikke diskriminere andre custodians i forhold til VP Securities. Det ville være et klart brud på grundlæggende regler om kapitalens fri bevægelighed og garantien omkring fri tjenesteydelser inden for EU. Skattestyrelsen kan derfor ikke forlange af aktionærer, der har deres depot hos en udenlandsk custodian, at fremlægge en kæde af custodians og subcustodians helt op til VP Securities som eneste accepterede bevis for ejerskab. Ingen aktionær i et selskab har adgang til disse sub-custody-kæder. Disse kæder kan allerhøjest Skattestyrelsen som del af den offentlige forvaltning med statsmagtens tvangsmidler fremtvinge fra de forskellige custodians i kæden af custodians. Dette har Skattestyrelsen dog ikke gjort. Det må i den foreliggende sag komme Skattestyrelsen til skade under officialmaksimen.

Registreringen af ejerskab af aktier ved en hvilken som helt autoriseret og kontrolleret CSD (custodian) i EU skal have den samme bevisværdi. Skattestyrelsen kan ikke gøre engelske custodians til andenrangs sammenlignet med den danske CSD VP Securities.

Som Skattestyrelsen helt rigtigt har bemærket, har pensionsplanerne mange steder anført, at VP Securities ikke har et retvisende ejerregister, og at aktiehandler ikke nødvendigvis gennemføres ved levering af aktier mellem custodians, idet handler først afvikles ved overførsler af aktier internt (bogføringsmæssigt) hos hver enkelt custodian.

Dette faktum, som følger af EU-lovgivningens liberalisering af kapitalmarkederne, forsøger Skattestyrelsen af udrydde ved den simple påstand:

> "Sådanne anbringender kan ikke føre til, at pensionsplanerne skal have medhold i deres klage".

Skattestyrelsen fremkommer ikke med nogen juridisk begrundelse for, hvorfor Landsskatteretten skulle se bort fra gældende regler i EU for handel med værdipapirer, blot fordi resultatet medfører, at hverken VP Securities kan bruges som eneste retsgyldige kilde til at dokumentere ejerskab af danske aktier, eller at dokumentationen af kæder af custodians og penge henholdsvis aktier ikke er et praktisk muligt bevis for ejerskab under EU-reguleringerne.

Skattestyrelsen nægter simpelthen at acceptere faktum i sagen, at ejerskab er et juridisk begreb, og at erhvervelsen heraf er bestemt af juridiske regler. Juridiske regler, som til dels er danske og til dels er europæiske og endda internationale (Den Haag-konventioner).

**9.3.2 Dokumentation for at Solo-gruppen har besiddet aktier**

Skattestyrelsen forlanger i førersagerne det sammenfattende indlæg af den 9. august 2019, afsnit 5.1, side 31, at der skal fremlægges dokumentation for at Solo- gruppen har "besiddet" de aktier, som pensionsplanerne har ejet, og som Solo- gruppen hat attesteret ejerskab til.

Den af Skattestyrelsen forlangte kæde af custodians og sub-custodians kan ingen klient i nogen som helst bank fremlægge. Derfor heller ikke pensionsplanerne. Idet det er teknisk umuligt for en hvilken som helst kunde hos de internationale custodians, der hænger bag en lang kæde af sub-custodians, anerkender allerede Europa-Parlamentets og Rådets direktiv 98/26/EF af den 19. maj 1998 om endelig afregning i betalingssystemer og værdipapirafregningssystemer (Settlement Finality-direktivet) også endeligheden (og dermed den retligt bindende virkning) af en registrering af en værdipapirafvikling gennemført ved en autoriseret clearing- agent og opbevaringen af værdipapirerne hos en custodian. En registrering hos den CSD, hvor aktierne oprindeligt blev udgivet, eller dokumentationen af en kæde af custodians forlanger direktivet ikke, for at ejerskabet anerkendes, selv i forhold til tredjemand. Direktivets overvejelsesgrund nr. 11 fastslår derimod udtrykkeligt, at:

> *"overførselsordrer og netting af sådanne ordrer bør have retsvirkning i alle medlemsstaters retssystemer og være bindende for tredjeparter".*

Artikel 3 fastlår videre, at:

> *"Overførselsordrer og netting har retsvirkning og er bindende for tredjeparter, selv i tilfælde af insolvensbehandling mod en deltager, såfremt overførselsordrerne var indgået i systemet in- den tidspunktet for insolvensbehandlingens indledning"*

Skattestyrelsens krav om en ejerskabskæde er således i direkte strid med EU-lovgivningen. Finality-direktivet ligestiller settlement hos enhver autoriseret og kontrolleret clearing-agent og custodian med afregningen af en værdipapirhandel hos den CSD, hvor aktierne blev udgivet.

**9.3.3 Skrivelser fra SØIK og VP Securities**

Skattestyrelsen anfører i førersagerne i det sammenfattende indlæg af den 9. august 2019, at man efter henvendelse til SØIK den 23. november 2017 fik oplyst, at SØIK på daværende tidspunkt ikke kunne bekræfte, at pensionsplanerne havde modtaget udbytte fra de danske aktier.

Dette er da også ganske naturligt. Det kan som nævnt ovenfor ingen bekræfte.

Det bemærkelsesværdige er herved, at SØIK netop ikke skriver, at de kan udelukke, at pensionsplanerne har modtaget udbytte. For det kan nemlig heller ingen.

Det samme gælder SØIKs udtalelse vedr. ejerskab af danske aktier. SØIK udelukker ikke, at pensionsplanerne har været ejere af aktierne. De kan kun sige, de ikke kan bekræfte det. Det er desværre helt naturligt, når man ikke har udsøgt computersystemerne fra Solo-gruppen. At SØIK ikke har gjort det, fremgår netop af det faktum, at SØIK har anmodet VP Securities om at bekræfte, om pensionsplanerne har ejet de danske aktier. Havde man undersøgt computerne, kunne man selv havde udtalt sig og var ikke nødt til at henvende sig til VP Securities.

Men VP Securities ved jo netop intet om aktionærer, der har deres aktier hos subcustodians i hele verden. Derfor bekræfter VP Securities i bilag N heller ikke positivt, at de kan udelukke pensionsplanernes ejerskab. I VP Securities' skrivelse af den 13. august 2019 henleder VP således også udtrykkeligt